# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TENNESSEE
### AT CHATTANOOGA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | No. 1:18-cr-161-HSM-CHS |
| | ) | |
| DORSEY EUGENE MCGAHEE | ) | |

## REPORT AND RECOMMENDATION

I.      **Introduction**

Before the Court is Defendant Dorsey McGahee's Motion to Suppress. [Doc. 26].[1] On July 11, 2019, the undersigned conducted a hearing on the suppression motion. Attorney Keith Davis represented McGahee, who was also present at the hearing. Special Assistant United States Attorney Kevin Brown represented the Government.

In his suppression motion and as argued by Attorney Davis at the hearing, McGahee asserted that he was not read his *Miranda* rights[2] before he was interrogated by police. The Government countered that any pre-*Miranda* questioning by law enforcement fell within *Miranda*'s "booking exception."[3] McGahee also argued that he invoked his right to have counsel present immediately after his *Miranda* rights were read to him, but police officers continued to interrogate him without counsel present. The Government responded that McGahee did not unequivocally invoke his right to counsel. And, further, he signed a waiver relinquishing his right to have counsel present during the interrogation.

---

[1] McGahee filed his original Motion to Suppress on May 22, 2019. [Doc. 26]. Then, on May 31st, McGahee filed a Revised Memorandum of Law in Support of his Motion to Suppress [Doc. 31], based on newly-obtained evidence. In making its findings, the Court relied upon McGahee's Revised Memorandum of Law [Doc. 31] since it contained new evidence.
[2] *See Miranda v. Arizona*, 384 U.S. 436 (1966)
[3] *See Pennsylvania v. Muniz*, 496 U.S. 582 (1990) (noting that routine gathering of biographical data is not ordinarily considered "interrogation" under *Miranda*).

For the following reasons, the undersigned **RECOMMENDS** that Defendant's Motion to Suppress [Doc. 26] be **GRANTED IN PART** and **DENIED IN PART**.

## II.     Facts

The criminal charges against McGahee arose as a result of an armed bank robbery committed at the Trust Federal Credit Union located on Gunbarrel Road in Chattanooga, Tennessee, on October 18, 2016. [Doc. 1]. Wearing "old man" style masks and brandishing handguns, two men robbed the bank and fled from the scene in a silver Jeep Compass. A bank employee called 911 and described the Jeep to an operator who, in turn, dispatched police officers to the bank to investigate. The police issued a "be on the lookout" advisory for the silver Jeep that had been used as a get-away vehicle.

Shortly after the robbery, an off-duty police officer observed a silver Jeep Compass— occupied by two men—parked outside a nearby medical plaza. Realizing that they had been spotted by the officer, the two men sped away, leading police on a high-speed chase. At some point, the driver of the Jeep lost control of the vehicle and crashed into a telephone pole near an office park. The two men exited the vehicle and attempted to escape on foot. When police officers searched the wrecked Jeep, they recovered a black knit cap, a gun, a pen with the bank's logo, and a keyring containing a key to a Cadillac vehicle. They also found an "old man" style mask nearby. Quincy Richards—one of the men who had fled from the wrecked Jeep—was caught by police after he leaped over a concrete barrier wall and crossed eight lanes of traffic on Interstate 75.

The other man, later identified as Dorsey McGahee, led the police on a more extended chase. After exiting the Jeep Compass, McGahee ran to the parking lot of a neighboring office building. There he encountered a woman sitting inside her Lexus SUV. McGahee forced entry into the car, punched the female driver, and ordered her out of the car. After carjacking the vehicle,

McGahee drove away continuing his efforts to escape. Unbeknownst to McGahee, the driver of the Lexus left her cell phone in the vehicle when she was carjacked. Police later "pinged" that cell phone and determined that the phone—and, more importantly, the Lexus in which it was still located—was at an abandoned house. When law enforcement arrived at the vacant residence, they found the Lexus, but McGahee was not there. They did, however, uncover a second "old man" style mask in the vehicle.[4]

Returning to the wrecked Jeep Compass, police officers ran the registration and found that the vehicle belonged to Thrifty Car Rental. Officers then visited the local Thrifty Car Rental and learned that management had recently fired several temporary employees for driving rental vehicles "off the books" and without permission. When police reviewed a list of the temporary employees of Thrifty who had been recently terminated, McGahee was on the list. The officers researched McGahee's background and discovered that McGahee owned a Cadillac. With the Cadillac key recovered from the wrecked Jeep—as well as McGahee's name on the list of Thrifty Car Rental employees who had been terminated—the authorities identified McGahee as a suspect.

Task Force Officer Jeremy Winbush entered McGahee's name into the Tennessee Offender Management Information System ("TOMIS"), a database utilized by the Tennessee Department of Correction. Through that database, Officer Winbush discovered that McGahee's girlfriend, Nakeda Eady, visited him seven times in 2015 while he was imprisoned in state custody. Also, through their investigation into McGahee's background, law enforcement discovered that McGahee was on parole and was required to register as a sex offender. When police were unable to locate McGahee, they contacted his parole officer. The parole officer then called McGahee and directed him to report to the parole office. McGahee complied with this request.

---

[4] The Tennessee Bureau of Investigation later conducted a serology test on the mask and found McGahee's DNA on it.

When McGahee arrived at the parole office, Winbush met him and placed McGahee in handcuffs. McGahee asked if he was being placed under arrest. Winbush replied that he was not under arrest but indicated that he was being detained for an interview. Winbush asked McGahee whether he had any drugs, guns, weapons, or other contraband on his person. McGahee responded that he did not. Another police officer then drove McGahee to the local FBI office. Upon arrival at the FBI office, Winbush placed McGahee in an interview room where he remained in handcuffs. Officer Winbush sat across the table from McGahee with a pen and notepad in hand.

Without reading McGahee his *Miranda* rights,[5] Winbush obtained the following information during the interview:

- Winbush asked McGahee where he was staying. McGahee responded that he lived with his girlfriend in Apartment 302 at Stone Ridge Apartments but sometimes stayed at his mother's house.

- Winbush asked if McGahee's girlfriend is related to the "Eadys." McGahee replied that his girlfriend was Nakeda Eady.

- Referencing Eady, Winbush asked if she was employed. McGahee responded that she was recently laid off from—or had quit her job at— Memorial Hospital.

- Winbush asked for Eady's phone number. McGahee provided Eady's phone number.

- Winbush asked whether Eady was at home. McGahee indicated that she probably was at home, but he was not certain.

- Winbush asked McGahee whether Eady drove a vehicle, and also asked what make and color of the car she drove. McGahee responded that she drove a blue BMW.

Winbush documented McGahee's answers, left the FBI office, and drove to the Stone Ridge Apartments to interview Nakeda Eady. Winbush testified at the hearing that he knew Eady from a

---

[5] There is a brief period where the video camera in the interview room was off. Winbush testified at the suppression hearing that he asked McGahee what his name was, where he lived, and where he worked. In response to the question about his residence, McGahee said that that he lived in the 37th Street apartments across from a school.

4

previous, unrelated case that he had investigated. Upon questioning, Eady provided McGahee's telephone number to Winbush. She also gave consent for Winbush to search her phone. As Winbush looked at the contents of Eady's phone, he viewed her contacts, call logs, and text messages. He noted that she had a number saved in her contacts as "Nuke." Eady confirmed that "Nuke" was McGahee's nickname and that the corresponding phone number was his. In looking at the phone, Winbush was able to verify several calls McGahee made to Eady at around the time of the bank robbery and the carjacking. Winbush then questioned Eady about these calls from McGahee. She responded that, in one of the calls made during that time, McGahee was upset and indicated that he was looking for "Quincy." Eady also advised Winbush that McGahee had previously driven a rental vehicle while employed at Thrifty Car Rental.

While Winbush was questioning Eady at her apartment, two agents entered the interview room at the FBI office where McGahee was waiting. They identified themselves as Special Agent Galloway with the FBI and Special Agent Puckett with the Chattanooga Police Department's Major Crimes Unit. The agents' interview—before giving McGahee his *Miranda* rights—is summarized as follows:

- Galloway told McGahee that he and Puckett had just left McGahee's parents' house.

- Galloway asked McGahee if he had any idea why McGahee was at the FBI office. McGahee replied, "no."

- Galloway said that they were investigating a bank robbery and carjacking. McGahee interrupted and asked what it had to do with him. Galloway said that it had a lot to do with him because there was "a lot of stuff" that led them to McGahee.

- Puckett interrupted Galloway and said that there were a few "formalities" to deal with before discussing the evidence.

- Galloway told McGahee that the "formalities" were to advise him of his rights. Galloway then presented an advice-of-rights form to McGahee.

5

Galloway asked McGahee if he could read and write. McGahee said that he could.

- Galloway read the form aloud to McGahee, which states the following:

    > Before we ask you any questions, you must understand your rights. You have the right to remain silent. Anything you say can be used against you in court. You have the right to talk to a lawyer for advice before we ask you any questions. You have the right to have a lawyer with you during questioning. If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish. If you decide to answer questions now without a lawyer present, you have the right to stop answering at any time.

- Galloway summarized the last statement to McGahee by saying: "So basically if we are talking and you don't want to talk anymore, you don't have to say anything, and you can stop at any time." McGahee responded: "Well if a lawyer can come down here, can I get a lawyer? Cause I don't know why ya'll saying I did any of this cause I've been out trying to get me a job and doing other little stuff. I ain't did no [expletive] like this here."

- Galloway said: "Well, that is only something that you can decide and make the decision. We are here to talk to you, and that's up to you." McGahee interrupted: "I'll talk to you, but I don't know why ya'll talking about I did no carjacking or no [expletive] bank robbery."

- Galloway responded: "Well if you continue to want to talk to us, here is the consent."

- Galloway then read aloud the consent portion of the form, which states: "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." McGahee said, "Ok."

- Galloway then slid the form across the table to McGahee, who signed it. McGahee gave the form back to Galloway. Both Galloway and Puckett then signed the form.

After McGahee waived his *Miranda* rights by signing the consent form, Galloway and Puckett questioned McGahee without an attorney present. During the interview, McGahee outlined his activities on the day of the bank robbery. He also admitted to having used Thrifty Car Rental

vehicles "off the books."[6] He further told authorities about his association with Quincy Richards. McGahee volunteered information that he had allowed Quincy Richards to borrow his car and that Richards was not supposed to give his car keys to anyone else.

After authorities learned about McGahee's relationship with Quincy Richards, they obtained and reviewed telephone calls that Richards had made from the Hamilton County Jail following his arrest. One of Richards' calls was to McGahee's cell phone number—the same number that Officer Winbush had obtained from Nakeda Eady when she identified his nickname as "Nuke." In a recorded jailhouse phone call made by Quincy Richards, law enforcement heard Richards refer to the other party as "Nuke." Later, officers discovered a message that Quincy Richards etched into a piece of Styrofoam and attempted to pass along to another inmate, which included McGahee's phone number.

Based on the evidence amassed by law enforcement, they concluded that McGahee and Richards had robbed the bank together and that McGahee had engaged in carjacking as he was trying to escape from police pursuit following the bank robbery. A grand jury later indicted McGahee for bank robbery under 18 U.S.C. §§ 2113 as well as carjacking under 18 U.S.C. § 2119. The grand jury also charged McGahee with two criminal counts under 18 U.S.C. § 924(c), which authorizes heightened criminal penalties for using, carrying, or possessing a firearm in connection with any federal "crime of violence or drug trafficking crime."

McGahee now argues that Officer Winbush should have administered *Miranda* rights before questioning him about his address and girlfriend. For this reason, he requests that the Court suppress his initial, pre-*Miranda* statements to Officer Winbush as well as any evidence derived

---

[6] Officer Winbush clarified at the hearing on the present motion that, based the agents' discussions with Thrifty Car Rental management, using a Thrifty Car Rental vehicle "off the books" meant that employees were using the rental vehicles without permission or payment. Essentially, they were simply borrowing the rental cars without any written record being made.

as a result of information gleaned from those statements. More specifically, McGahee argues that any evidence characterized as "fruit of the poisonous tree" should be suppressed, *to wit*: (1) evidence that McGahee violated the sex-offender registry laws; (2) statements made to officer Winbush by McGahee's girlfriend, Nakeda Eady; and (3) evidence gleaned by Officer Winbush from Eady's cell phone.

McGahee also argues that he invoked his right to counsel during the interrogation by Agent Galloway and Officer Puckett and that the interrogation should have ceased as soon as he asked for a lawyer. For that reason, McGahee seeks to suppress his statements to Galloway and Puckett as well as any derivative evidence gained as a result of those statements.

The Government responded in opposition. First, concerning the statements that McGahee made to Officer Winbush and the derivative evidence from those statements, the Government argues that Winbush's questioning fell within the "booking exception" under *Miranda*. In support, Officer Winbush testified at the hearing that he refrained from advising McGahee of his *Miranda* rights because: (1) McGahee was not under arrest at the time; and (2) he did not ask McGahee any accusatory questions related to the underlying crimes—bank robbery or carjacking. For those reasons, Officer Winbush did not believe it was necessary to provide *Miranda* rights.

Second, with respect to McGahee's interrogation by Agent Galloway and Officer Puckett, the Government argues that McGahee did not invoke his right to counsel during that interrogation. And, in fact, McGahee waived his right to counsel by signing a consent form.

III.   **Discussion**

A.      **Overview of *Miranda***

The Fifth Amendment provides that an individual may not be "compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. To that end, *Miranda* requires police

officers to advise suspects of their rights—including the right to remain silent—before engaging in a "custodial interrogation." *United States v. Panak*, 552 F.3d 462, 465 (6th Cir. 2009).

For a violation of *Miranda*'s requirements to occur, criminal defendants must establish that they were "in custody" and "interrogated." To trigger *Miranda* warnings, defendants must also establish that the interplay between being "in custody" and being "interrogated" was in the nature of an "incommunicado interrogation in a police-dominated atmosphere." *Illinois v. Perkins*, 496 U.S. 292 (1990) (quoting *Miranda*, 384 U.S. at 445). In other words, for defendants to succeed, they must demonstrate, by a preponderance of the evidence, that the interview was a custodial interrogation. *See United States v. Smith*, 783 F.2d 648, 650 (6th Cir. 1986).

*Miranda* rights need to be read "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" *Oregon v. Mathiason*, 429 U.S. 492, 495 (1977). To determine whether a person is "in custody" for *Miranda* purposes, courts look to "the objective circumstances of the interrogation . . . to determine how a reasonable person in the position of the individual being questioned would gauge the breadth of his or her freedom of action[.]" *United States v. Luck*, 852 F.3d 615, 621 (6th Cir. 2017) (quoting *Panak*, 552 F.3d at 465). The ultimate question courts must answer is whether, based on the totality of the circumstances, a suspect's movement was restricted to a degree associated with a formal arrest. *Panak*, 552 F.3d at 465. The Sixth Circuit has laid out four non-exhaustive factors to guide the inquiry: "(1) the location of the interview; (2) the length and manner of the questioning; (3) whether there was any restraint on the individual's freedom of movement; and (4) whether the individual was told that he or she did not need to answer the questions." *Id.*; *see also Thompson v. Keohane*, 516 U.S. 99, 112 (1995) (asking "would a reasonable person have felt he or she was not at liberty to terminate the interrogation and leave[?]").

The totality of the circumstances supports the finding that McGahee was "in custody" for *Miranda* purposes when he was questioned by Officer Winbush. The short duration of Officer Winbush's questioning of McGahee lends some support to the Government's contention that the interrogation was non-custodial. *See Panak*, 552 F.3d at 467 (noting that interviews between 45 minutes to an hour, for example, are generally deemed non-custodial); *see generally United States v. Crossley*, 224 F.3d 847, 862 (6th Cir. 2000) (less-than-an-hour interview); *United States v. Mahan*, 190 F.3d 416, 420, 422 (6th Cir.1999) (hour-and-a-half interview).

The remaining factors, however, strongly suggest that McGahee was in custody during his interrogation by Officer Winbush. As to the location, it took place in an interview room at the FBI office. *See United States v. Hinojosa*, 606 F.3d 875, 883 (2010) (noting that police stations are inherently more coercive environments than a suspect's home or other environment); *United States v. Ridley*, 199 F. Supp. 2d 704, 713 (S.D. Ohio 2001) ("Although being questioned in an FBI office may constitute a coercive environment, such an environment, in and of itself, does not result in a custodial interrogation."). McGahee was also restrained with handcuffs upon his arrival at the parole office and remained handcuffed throughout his interview at the FBI office. Further, he was not free to leave—the very definition of "in custody."

The Government seemingly concedes that McGahee was in custody during his interrogation by Officer Winbush; however, it argues that Winbush's questioning fell within the "booking exception" to the *Miranda* requirements.

### B.     Application of *Miranda*'s "Booking Exception"

In considering the booking exception, the Court starts with the general proposition that "[a]n 'interrogation' comprises 'not only [ ] express questioning, but also any words or actions on the part of the police that the police know are reasonably likely to elicit an incriminating response from the suspect.'" *United States v. Pacheco-Lopez*, 531 F.3d 420, 423 (6th Cir. 2008) (quoting

*Rhode Island v. Innis*, 446 U.S. 291, 301 (1980)). There are exceptions to the *Miranda* requirement, like the "booking exception," where asking a suspect about biographical information generally is not considered an "interrogation" for *Miranda* purposes. *See Muniz*, 496 U.S. 582 (1990) (noting that routine gathering of biographical data for bookings, such as name, address, height, weight, eye color, date of birth and current address, are not ordinarily considered "interrogation" under *Miranda*); *United States v. Ozuna*, 170 F.3d 654, 657 n.1 (6th Cir. 1999) ("[N]ot all questioning of in-custody suspects constitutes interrogation triggering *Miranda* protections. In the context of routine booking following an arrest, this Court has held that 'routine biographical questions are not ordinarily considered interrogation.'") (quoting *United States v. Clark*, 982 F.2d 965, 968 (6th Cir. 1993)); *United States v. Avery*, 717 F.2d 1020, 1025 (6th Cir. 1983) (routine procedural questions to secure biographical data does not constitute interrogation). The Court is mindful that the "'booking exception' to *Miranda* requires the reviewing court to carefully scrutinize the facts, as '[e]ven a relatively innocuous series of questions may, in light of the factual circumstance and the susceptibility of a particular suspect, be reasonably likely to elicit an incriminating response.'" *Pacheco-Lopez*, 511 F.3d at 423-24 (quoting *Avery*, 717 F.2d at 1025).

In determining the applicability of the booking exception, courts have established guidelines. One such direction deals with the "place" and "manner" of the questioning. For the "place" requirement, "[i]n the majority of cases . . . appl[ying] the booking exception . . ., [such questioning] occurred at the police station. Application of the booking exception is most appropriate at the station, where administrative functions such as bookings normally take place." *Pacheco-Lopez*, 531 F.3d at 425. As to the "manner" requirement, the booking exception "usually involve[s] active documentation of a defendant's answers . . . . [because] [s]uch documentation— including arrest-related paperwork or notes—would be expected during questioning about a

defendant's background, as the purpose of such inquiry is to gather sufficient data to identify the defendant (i.e. for record-keeping)." *Id*. In the present case, Officer Winbush's initial interrogation could arguably fulfill the booking exception's "manner" requirement, *to wit*, he documented McGahee's responses by jotting them down on a notepad; however, the interrogation did not fulfill the booking exception's "place" requirement. McGahee was not being booked into jail. He was being questioned at an FBI office. Moreover, Officer Winbush testified that McGahee was not even under arrest at the time that he was being questioned, so the Government cannot argue that the questioning related to "arrest-related paperwork."

Beyond the place and manner requirements of the booking exception, the substantive content of Officer Winbush's questions renders the booking exception inapposite. Officer Winbush initially inquired as to where McGahee lived. McGahee responded that he lived at a specific apartment complex with his girlfriend and that he sometimes stayed at his mother's house. Upon hearing the name of the particular apartment complex where McGahee lived, Officer Winbush asked him if his girlfriend was related to the "Eadys"—a family known by Winbush to live in that same apartment complex. McGahee responded that his girlfriend was Nakeda Eady. Winbush then questioned McGahee about where Nakeda Eady worked; what her phone number was; if she was at home; and the make and color of her car. In doing so, Officer Winbush strayed from the type of questions that the "booking exception" permits. In a similar case, a federal district court in Minnesota held that these "questions about defendant's girlfriend [are] outside the booking exception because they [do] not reasonably relate to those routine 'questions to secure biographical data necessary to complete booking.'" *United States v. Robinson*, 441 F. Supp. 2d 1029, 1035 (D. Minn. 2006), *aff'd*, 536 F.3d 874 (8th Cir. 2008) (quoting *Muniz*, 496 U.S. at 601) (finding that information about defendant's girlfriend fell outside the booking exception).

The booking exception is also subject to an important caveat: *Miranda* only exempts questions related to "biographical data *necessary to complete booking or pretrial services*." *Muniz*, 496 U.S. at 601 (internal quotation marks omitted) (emphasis added). For example, the Government cited *United States v. King*[7] and *United States v. Askew*[8] in support of the applicability of the booking exception in this case. Both of those cases are distinguishable, however, based upon the type of information sought by law enforcement as the defendants were being booked into jail. *See, e.g.*, *King*, 165 F.3d at 29 (noting authorities took defendant to the police station and booked him into the jail following a traffic stop that uncovered a 9mm pistol and 11.5 grams of crack cocaine); *Askew*, 2012 WL 369539, at *1 ("Askew's phone number was obtained during the regular booking process. The process did not involve questioning about the alleged crime. It consisted only of gathering basic identifying data recorded on a standard Drug Enforcement Administration booking form known as a DEA 202.").

When Officer Winbush interviewed McGahee at the FBI office, he was not completing an intake form necessary to book McGahee into jail. Clearly, the purpose of Winbush's questioning was not to book McGahee into jail but rather to elicit potential leads for further investigation. *See, e.g.*, *United States v. Orozco Ramirez*, No. 117CR185LMMAJB01, 2019 WL 2165920, at *7 (N.D. Ga. Apr. 22, 2019), *report and recommendation adopted sub nom. United States v. Ramirez*, No. 117CR00185LMMAJB, 2018 WL 8337421 (N.D. Ga. May 17, 2018) (stating that since "the DEA was not actually booking any of the arrestees into jail, and thus the questioning about Orozco's address was for investigatory purposes that should have not been asked in the absence of a *Miranda* waiver."); *see also Askew*, 2012 WL 369539, at *2 (noting that "the 'booking exception' does not provide an absolute exemption for all such questioning."). Officer Winbush's questioning was

---

[7] 165 F.3d 29 (6th Cir. 1998).
[8] No. 3:10CR-147-S, 2012 WL 369539, at *1 (W.D. Ky. Feb. 3, 2012).

outside the booking process. Therefore, he should have provided McGahee proper *Miranda* warnings before initiating the interview.

The Court finds that, because the "booking exception" does not apply, McGahee's pre-*Miranda* statements to Officer Winbush should be suppressed, and will **RECOMMEND** that Defendant's motion to suppress be **GRANTED IN PART** to that limited extent.

### C. Suppression of Derivative Evidence ("Fruit of the Poisonous Tree")

Defendant McGahee also argues for the suppression of any derivative evidence obtained by Winbush as a result of his investigation flowing out of McGahee's statements. The Government maintains that there are two reasons that the evidence derived from Officer Winbush's pre-*Miranda* interview of McGahee (the so-called "fruit of the poisonous tree")[9] should not be suppressed. These reasons are discussed below.

### 1. Inevitable-Discovery Doctrine

The Government argues that the "inevitable-discovery doctrine" should apply to prevent suppression of this evidence. *See generally United States v. Hilton*, 625 F. App'x 754, 759 (6th Cir. 2015) (finding that the "inevitable[-]discovery doctrine applies . . . to potential Fifth Amendment violations."). The inevitable-discovery doctrine "provides that evidence secured through unlawful means is admissible if the prosecution can show that it 'ultimately or inevitably would have been discovered by lawful means[.]'" *United States v. Figueredo-Diaz*, 718 F.3d 568, 574 (6th Cir. 2013) (quoting *Nix v. Williams*, 467 U.S. 431, 444 (1984)). "For example, if a defendant's coerced statement leads police to recover a dead body, evidence of the body, including

---

[9] The derivative evidence McGahee seeks to suppress includes Nakeda Eady's admissions to Officer Winbush concerning McGahee's telephone number; her admission that McGahee called her during the time of the bank robbery and car-jacking and her description of his demeanor on those calls; McGahee's expressed concern to Eady during those conversations about "Quincy's" location; McGahee's use of different vehicles from Thrifty Car Rental; Officer Winbush's search of Nakeda Eady's phone; and Officer Winbush's discovery that McGahee's home address put him close proximity to a school such that he was in violation of the sex-offender registry requirements.

14

its condition as shown by the autopsy, is admissible at trial if the prosecution shows that the body would have been discovered lawfully, by other means such as a volunteer search already underway that would have covered the field where the body was located." *Id.* "The doctrine demonstrates the exclusionary rule's aim of deterrence: for even where discovered evidence is the undoubted product of illegality, '[i]f the prosecution can establish by a preponderance of the evidence that the information ultimately or inevitably would have been discovered by lawful means . . . [,] then the deterrence rationale has so little basis that the evidence should be received.'" *Id.* at 574-75 (quoting *Nix*, 467 U.S. at 444).

In this case, Officer Winbush already possessed Nakeda Eady's identity before he interviewed McGahee. Before his questioning of McGahee, Officer Winbush had run a search on McGahee through the Tennessee Department of Correction's TOMIS database. Through that search, Officer Winbush learned that Nakeda Eady visited McGahee multiple times during 2015 while he was in state prison. Based on a prior, unrelated case where Officer Winbush was involved, he knew who Nakeda Eady was and where she lived. According to the Government, Officer Winbush—armed with this information—was prepared to find and interview Nakeda Eady concerning her relationship with McGahee even absent McGahee's admission that he was living with Ms. Eady. In other words, McGahee's admission only confirmed what Officer Winbush already knew. It was inevitable that Officer Winbush was going to interview Nakeda Eady about McGahee, and that, upon doing so, he would have obtained the same information concerning McGahee's address, phone number, his nickname ("Nuke"), McGahee's phone calls to Eady, and the Thrifty Car Rental vehicles that he drove. Further, upon discovery of such information, Officer Winbush would have searched Eady's phone—with her permission—just as happened here.

For these reasons, while the Court finds that Officer Winbush should have advised McGahee of his *Miranda* rights prior to questioning him about Nakeda Eady, the Court finds that the inevitable-discovery doctrine would likely preclude suppression of the evidence Officer Winbush obtained through his conversation with Nakeda Eady and his review of her mobile phone. It is not, however, necessary for the Court to apply the inevitable discovery doctrine to make a finding that the derivative evidence, in this case, should not be suppressed.

### 2.   Fruit of the Poisonous Tree

Beyond the inevitable-discovery doctrine, there is an additional reason not to suppress evidence that was arguably derived from Officer Winbush's inappropriate pre-*Miranda* questioning of McGahee. Such evidence—characterized as "fruit of the poisonous tree"—does not have to be suppressed simply because a defendant has not been advised of *Miranda* rights prior to questioning.

McGahee and the Government both cite to *Wong Sun v. United States*, 371 U.S. 471, 485 (1963) and its progeny for the proposition that evidence which is illegally obtained may not be used for any purpose. While this is generally true, there is an important distinction which comes into play in this case, *to wit*, evidence obtained in the wake of a *Miranda* violation is not tantamount to evidence illegally obtained as a result of an illegal search and seizure, a violation of due process or an actual violation of a person's right against self-incrimination. *See United States v. Patane*, 542 U.S. 630, 642 (2004) ("[U]nlike unreasonable searches under the Fourth Amendment or actual violations of the Due Process Clause or the Self–Incrimination Clause, there is, with respect to mere failures to warn, nothing to deter. There is therefore no reason to apply the 'fruit of the poisonous tree' doctrine of *Wong Sun* . . . ."); *United States v. Flack*, No. 3:08-CR-108, 2009 WL

5031320, at *3 (E.D. Tenn. Dec. 11, 2009) (rejecting application of the Fourth Amendment *Wong Sun* analysis to a Fifth Amendment *Miranda* violation).

Consequently, Officer Winbush's failure to read *Miranda* rights to McGahee prior to questioning him does not require the suppression of derivative evidence obtained by Officer Winbush as a result of such questioning. *United States v. Sangineto-Miranda*, 859 F.2d 1501, 1517 (6th Cir. 1988) (quoting *Oregon v. Elstad*, 470 U.S. 298, 308 (1985)) ("[T]he case was not controlled by the doctrine expressed in *Wong Sun* that fruits of a constitutional violation must be suppressed. Although the unwarned confession had to be suppressed, the third-party witness's testimony did not."); *United States v. Reese*, 509 Fed. App'x 494, 503 (6th Cir. 2012) (citing *Patane*, 542 U.S. at 637) ("The Fifth Amendment's protection against compelled self-incrimination, from which *Miranda*'s warning requirement is derived, . . . prevents the government from introducing unwarned statements against a criminal defendant at trial, but it does not apply to physical evidence."); *United States v. Bradley*, 163 Fed.Appx. 353, 357 (6th Cir. 2005) ("[T]he 'fruit of the poisonous tree' doctrine does not apply to physical evidence seized as a result of a *Miranda* violation.").

Suppression of derivative evidence from a *Miranda* violation is only justified when a defendant's statement was involuntary or coerced—neither of which apply here. *See Chavez v. Martinez*, 538 U.S. 760, 769 (2003) (emphasis in original) ("[T]hose subjected to coercive police interrogations have an automatic protection from the use of their involuntary statements (or evidence derived from their statements) in any subsequent criminal trial."); *United States v. Reese*, 509 Fed. App'x 494, 503 (6th Cir. 2012).

McGahee does not argue that his statements to Officer Winbush about his address and his girlfriend were involuntary or coerced. He simply contends that Winbush failed to read him his

*Miranda* rights before questioning him about these matters. While the Court agrees that Officer Winbush should not have engaged in this very limited pre-*Miranda* questioning, there is no basis to suppress the derivative evidence obtained by Officer Winbush. *Sangineto-Miranda*, 859 F.2d at 1517 ("[F]ailure to administer *Miranda* warnings, without more, does not automatically require suppression of the 'fruits' of the uncounseled statement. Where the uncounseled statement is voluntary, and thus not a product of 'inherently coercive police tactics or methods offensive to due process,'" . . ., there is no [F]ifth [A]mendment violation and the 'fruits' may be admissible in the Government's case in chief.") (referencing *Estad*, 470 U.S. at 317).

Consequently, the Court finds that the derivative evidence obtained through Officer Winbush's investigation should not be suppressed and will **RECOMMEND** that Defendant's motion to suppress such evidence be **DENIED**.

### D.      McGahee's Invocation of his Right to Counsel

Finally, McGahee contends that his statements to Agents Puckett and Galloway should be suppressed because they continued to question him after he invoked his right to counsel under *Miranda*. The critical question here is whether McGahee actually requested that he be permitted to have an attorney present as law enforcement questioned him.

The Fifth Amendment provides, in part, that "[n]o person shall be . . . compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. "[I]ndispensable to the protection of the Fifth Amendment privilege" is the right to have counsel present during an interrogation. *Miranda*, 384 U.S. at 470; *see also Rogers v. Kerns*, 485 F. App'x 24, 30 (6th Cir. 2012). The Fifth Amendment thus "requires law enforcement to advise a suspect before custodial interrogation that the suspect 'has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained

or appointed.'" *United States v. Villa-Castaneda*, No. 18-5136, 2018 WL 5817074, at *3 (6th Cir. Nov. 6, 2018) (quoting *Miranda*, 384 U.S. at 444). Waiver of these rights must be voluntary, knowing, and intelligent. *Id.*

To invoke the right to counsel, suspects must unambiguously articulate their desire to have counsel present such that a reasonable officer in the circumstances would understand the statement to be a request for an attorney. *Weissert v. Palmer*, 699 F. App'x 534, 540 (6th Cir. 2017); *see also Davis v. United States*, 512 U.S. 452, 459 (1994). Once such invocation is made, "[p]olice may not initiate further investigation of a suspect without counsel present*." Berry v. Warden, S. Ohio Corr. Facility*, 872 F.3d 329, 333 (6th Cir. 2017) (citing *Edwards v. Arizona*, 451 U.S. 477, 484-85 (1981)). A statement made after invoking the right to counsel is admissible only "if (1) the suspect, as opposed to the officers, initiates the interrogation with the police and (2) the suspect waives her right to counsel." *Bachynski v. Stewart*, 813 F.3d 241, 246 (6th Cir. 2015) (citing *Smith v. Illinois*, 469 U.S. 91, 94–95 (1984) (per curiam)).

Recently, in *United States v. Potter*,[10] the Sixth Circuit court stated the following:

> On to the merits. The Supreme Court in *Davis* set a high bar to trigger *Edwards*. To compel officers to end questioning, a "suspect must unambiguously request counsel." *Davis*, 512 U.S. at 459, 114 S.Ct. 2350. So "ambiguous or equivocal" requests for an attorney do not put reasonable officers on notice that the interrogation must stop. *Id. Davis* explained its rationale for this standard when responding to the argument that it might sometimes engender harsh results: "[T]he primary protection" for the Fifth Amendment, *Davis* said, "is the *Miranda* warnings themselves." *Id.* at 460, 114 S.Ct. 2350. While *Edwards* added a second layer of judicial protection on top of those warnings, *Davis* was "unwilling" to add a third one. *Id.* at 462, 114 S.Ct. 2350. And *Davis*'s bottom-line holding—that a suspect who said "[m]aybe I should talk to a lawyer" did not unambiguously ask for counsel—confirms that an individual must make a firm request (minus any ambivalent adverbs). *Id.*
>
> *Davis*'s clear command has doomed several *Edwards* claims in our circuit. Take, for example, the statement "I think I should talk to a lawyer, what do you think?" Was that an unambiguous request for counsel? No. *United States v. Delaney*, 443

---

[10] 927 F.3d 446 (6th Cir. 2019).

F. App'x 122, 130 (6th Cir. 2011). How about "'[i]t would be nice' to have an attorney"? Insufficient. *Ledbetter v. Edwards*, 35 F.3d 1062, 1070 (6th Cir. 1994); *cf. Henness v. Bagley*, 644 F.3d 308, 319–20 (6th Cir. 2011). Or "I really should have a lawyer, huh?" Equivocal. *United States v. Mays*, 683 F. App'x 427, 433 (6th Cir. 2017); *see also United States v. Amawi*, 695 F.3d 457, 484–85 (6th Cir. 2012).

*Id.* at 450–51. Like these cases, McGahee's inquiry, "Well if a lawyer can come down here, can I get a lawyer?" fails to constitute an unambiguous request for counsel. McGahee may have mentioned an attorney, but he never made a request to stop the interview to wait for an attorney. *See id.* (quoting *Tolliver v. Sheets*, 594 F.3d 900, 923 (6th Cir. 2010)) ("We have, by contrast, found requests for an attorney unambiguous (triggering *Edwards*) when a suspect told the police that he wanted to be left alone 'until I can see my attorney[.]'"). To the contrary, when McGahee asked about a lawyer's availability, Agent Galloway responded, "Well, that is only something that you can decide and make the decision. We are here to talk to you, and that's up to you." McGahee interrupted, saying, "I'll talk to you, but I don't know why ya'll talking about I did no carjacking or no [expletive] bank robbery." Agent Galloway then said, "Well if you continue to want to talk to us, here is the consent." Galloway then read aloud the consent portion of the form, which stated, "I have read this statement of my rights and I understand what my rights are. At this time, I am willing to answer questions without a lawyer present." McGahee said, "Okay," and signed the consent form.

The proof before the Court indicates that McGahee failed to unambiguously assert his right to counsel. No *Miranda* violation occurred in connection with his questioning by Agents Puckett and Galloway. *See id.* (finding that "[t]he mere mention of an attorney does not cut it. *Davis*, 512 U.S. at 459, 114 S.Ct. 2350. Nor does a question about having an attorney. *Delaney*, 443 F. App'x at 130"). The Court finds that McGahee understood his rights; he waived those rights; and the waiver was made knowingly and intelligently.

The Court finds that McGahee did not unequivocally assert his right to counsel and that his statement was given voluntarily and after a knowing and intelligent waiver of his *Miranda* rights. The Court will, therefore, **RECOMMEND** that McGahee's suppression motion be **DENIED** as to the invocation of his right to counsel.

## IV.    Conclusion

For the foregoing reasons, the Court **RECOMMENDS** that Defendant McGahee's Motion to Suppress [Doc. 26] be **GRANTED IN PART** and **DENIED IN PART** as follows:

1.    Defendants motion to suppress his pre-*Miranda* statements to Officer Winbush should be **GRANTED**, and such statements should be suppressed;

2.    Defendant's motion to suppress any derivative evidence discovered by Officer Winbush based upon his pre-*Miranda* questioning of Defendant should be **DENIED**, and such evidence should not be suppressed; and

3.    Defendant's motion to suppress statements made by Defendant to Agents Galloway and Puckett, as well as any derivative evidence obtained as a result of such statements, should be **DENIED** and such evidence should not be suppressed.

**ENTER.**

/s/ *Christopher H. Steger*
UNITED STATES MAGISTRATE JUDGE